Good morning, Your Honors. My name is Stuart Katz. I represent the plaintiff and appellant Matthew Blanford. I'm joined here this morning by John Poswell, my co-counsel, who will be handling the rebuttal argument, which we will be reserving some time for. We believe that to accept the district court's ruling in this case is to accept a radical change in the Fourth Amendment law regarding the use of deadly force in a Fourth Amendment context, where instead of an objective test requiring an imminent threat of death to create bodily injury, instead we have substituted a subjective standard with speculation sufficing. Three things I'd like to try to address in my argument this morning. One, I'd like to look at the facts or analysis of the shooting through a different perspective, through that of jeopardy analysis, which is how the officers, these defendant officers, were trained to look at the use of deadly force, and that has particular significance how the officers were trained in a qualified immunity context as well. Secondly, I'd like to address the recent Supreme Court decision in Brousseau v. Hagen, which is a case that clearly was cited by both of the parties in this matter, and I'd like to explain to the Court why we believe that in terms of the analysis of the facts in the law, in this case it has actually very little ultimate significance. And lastly, I would like to address, we believe, how the district court failed to make the proper inferences regarding the law in viewing the cross motions for summary judgment adjudication. Concerning jeopardy analysis, what that is, and the way these officers were taught is, and this training was to how, in other words, when the officers are trained, how do they make the fateful decision whether or not they're allowed to employ deadly force. And this is training that these officers not only received in general, but was training specifically given to them in the context of dealing with a situation when they're confronted with an armed individual. What jeopardy analysis requires is that three questions receive an objective answer of yes. One, does the person manifest or show some intent to cause someone death or serious bodily injury? Two, does the person have the means? In other words, is there a weapon that could hurt somebody? Three, is the threat imminent? In other words, if he has the intent and has the weapon, is he in a position where he can carry that out? If the answer is yes to all those three, then jeopardy attaches, and the officer may, but obviously isn't required, he may be able to make the fateful decision to use deadly force. If the answer is no to one or more of those questions, then jeopardy, then deadly force is not justified, and in that context jeopardy hasn't attached. Kagan. Obviously, this is a terrible case in many respects and a tragic result. And it's fairly easy in retrospect to make a lot of judgment calls. The question, of course, is not retrospective, but rather from the perspective of the police officers when they were confronted with this situation. And it seems to me that what makes this case so tough and unique is you have an armed person who was armed with an edged weapon who paid no attention to repeated orders to stop and drop that weapon, who was warned that if he didn't do that, he could be shot, and who made a --" who, in effect, flaunted the authority or appeared to be doing so by growling at the --" after these things had happened, then made a steady but nevertheless persistent beeline for a house in a residential area in the afternoon. And here's where I think the problem is. The officers do not know whether anybody's in that house or not or in the yard. I mean, they don't know that. So is that in and of itself sufficient in your view to make the use of force unconstitutional? One, I would indicate that the facts the courts have as recited are not facts as we believe the evidence shows them. But to ask the question, and it's not that unique a situation in that officers frequently confront people who are going through mental problems, and this young man at the time was --" But they don't know that. They don't, but they have. But in terms of what they do know --" Well, you could argue the effect of that is exactly the opposite, that if you've got somebody who appears to be deranged and behaving bizarrely, you have an increased need to get a weapon out of his hand. Now, this is not a Doyle case. I'm not disputing the desire to get the weapon out of his hand. Certainly, though, it's not merely a guess that there's something wrong with the young man in that the information that the officers actually had received were from several citizens who clearly expressed to the agency and information which was relayed to the officers that he seemed to be acting bizarre, but not dangerously, that he was sort of wandering in the street, that at one point he licked the sword, and that he wasn't threatening anyone. I think in terms of the House not being occupied, Your Honor, to get to that question, certainly I think the officers need to respond to the facts they actually see and confront. What happens here, though, Your Honor, is when he is first shot in the back, he is literally walking in front of his garage. The officer who shoots him, in terms of what the officer can objectively see, doesn't even know if there's a gate there. He doesn't know if it's a gate that someone can gain entrance to. He doesn't know whether or not Mr. Blanford intends to make a turn to the gate or not. So I don't believe on that fact he does have any constitutional right to shoot him. There's no one in imminent risk. The only person's ---- Kagan. No. See, this is what I'm trying to focus in on, because I think it's a really difficult issue. He doesn't know whether that house is occupied or not, or whether a child has just come home from school and is in the yard. He doesn't know any of those things. I mean, that's true. He doesn't know that. So is the officer supposed to make an assumption that's contrary to there being anybody at risk in the house, or is the officer supposed to make or allowed to make reasonably an assumption that somebody is in the house or in the yard, and if that's true, would be in real jeopardy from an edged sword? At that point, they couldn't shoot. They would be in real jeopardy if they were in Mr. Blanford's immediate presence, number one, and number two, that he showed any intent to hurt anybody. In this case, what the officers had viewed was, yes, he was nonresponsive, but it's undisputed in the facts, and the parties have agreed to, that he never threatened the officers. He never threatened them with a sword. He never made any threatening language. They didn't feel personally threatened by him. So in addition to the report they have from Citizens of No Problem, they've had the opportunity to observe him for several minutes, and rather than him trying to get away in the sense of trying to take evasive action, the officers have actually methodically closed the distance between themselves and Mr. Blanford. They've said repeatedly, Stott brought the sword, and he refuses to do that from their perspective. Yes. He doesn't do that. So and they've also said, if you don't drop the sword, you know, you could be shot. And he simply, from their perspective, ignores that. So you your position is that it was objectively unreasonable for the officers to base their action on the potential threat to somebody in the house or the yard. Absolutely. And the fact that he had a sword further limits the imminent danger he poses. Okay. I'm sorry. I'm sorry, Your Honor. Go ahead. I was going to contrast when you look at this Court's decision in Kernow v. City of Ridgecrest, where the person had a firearm, you look at the civil Ruby Ridge case, and you say these are people with firearms with much greater capacity to cause immediate serious physical injury. In the Ruby Ridge situation, the fellow was not going into, he was heading toward the house. That was a place of reference, not a place of assault. But again, if the assumption is that he's not going to hurt anyone in the house. But in this case, why is the assumption, what's the basis for assuming that Mr. Blanford is, who is returning home, and which I think is a real, which the officers acknowledge they considered as a possibility, why would the assumption be that you're going to take someone's life because you're saying you know something if he intends to hurt somebody and if someone's inside, and if he gets inside, and if we can't do anything in between, then we better kill him? Look, what I, the real question I wanted to ask then, too, is what's your closest authority? And that bears, of course, on the qualified immunity. Even if we were to agree that there would be a constitutional violation on the most favorable set of facts to Blanford, what's the closest authority saying that those officers should have known that they were not entitled under the Constitution to take into account the possibility of a child or an adult at the other end of that sword, and them then in a position of not being able to do a thing about it? I think the closest case is Kernel v. Ridgecrest. Well, but see, on the facts there, the – on the facts there in favor of the – of Cunauw, there was – he – they shot him before he even got to the point where he was doing anything. Your Honor, I realize that you sat on that panel, but having re-read that case a number of times, taking the version most favorable, what happens is they say the gun wasn't pointed at them, but apparently – They shot him before he picked the gun up. Well, the – On the facts most favorable to him. Maybe I misheard. In fact, what my understanding was, the Court said that he hadn't pointed the gun at anyone, that he had his hand on the gun. She said it wasn't on – it was on the muzzle of the gun. As he started to leave. Right. After – but in the situation, in terms of the context of that case, Your Honor, though, what happens are the police, because what they've observed, think that they're going in – the plan was to go in to rescue a woman who they saw being physically assaulted, who they knew had his assault rifle, who they were worried about saving, where they had objective information and a belief, reasonably, that they're going in to try to save this person. They had a plan to yell save – to save her, and whether the gun was pointed or not, he certainly grabbed the gun. He certainly was – objectively speaking, everyone was at more risk, including the person they were going to save, from what they had seen and what they reasonably believed in that situation, with the gun being very close to him. There's no dispute, I don't believe, that the assault rifle was certainly within reach of him. I think that case is probably the closest case. Now, in this case, following through on this jeopardy analysis, what I believe leads to the result that it's not a justified shooting, Lieutenant Powell, who was the Sheriff's Department's person most knowledgeable regarding training in deadly force, indicates as an example, if someone is standing – assuming we're on the ground floor – outside that window, jumping up and down, waving a knife at us, and he's saying, I'm going to kill you, pointing inside, I ask him, would that be a situation where an officer would be trained and expected to use deadly force? And he says, no, there's no jeopardy there. That weapon doesn't have the ability to pose an immediate threat to the people inside the house. And this training is important. You raised the question of qualified immunity. Under Drummond v. City of Anaheim, the Court specifically indicates that the fact that an officer is trained in a general or specific situation sort of takes away the ability to say there's not fair notice of what the Constitution does or doesn't require. And I think if you look at all these shootings, number one, there's no indication that he has an intent to hurt anyone, objectively speaking, whether there was a grunt or a growl. It was turned into a roar, I suppose, by the time the declarations had been prepared. Or it made no noise at all. It's a disputed fact. That can threaten the officers. And I know the Court said at the end of the sword, there's no indication he's holding the sword out that way. In fact, in terms of the – he's not holding the sword that way at any of the times, let alone the third time when he's shot in the back after being shot a number of times. This isn't a rapidly developing situation. The defendant's own expert acknowledged this was not a split-second decision situation. I realize I'm running low on time here. I wanted to briefly address Hagen v. Briseau just because – and maybe I'm wrong, but it just has sort of a dramatic sense of here this case has been fully briefed and here the Supreme Court case comes that we certainly have cited a number of times. But what I point out is that the Supreme Court's decision does not affect this case. Why I say that is because the basis of the Supreme Court decision clearly is, one, it was in a qualified immunity context in the sense that there was a split of authority between various circuits, a split that was recognized in the opinion. And certainly in this Court, for example, Robinson v. Solano County in an excessive force case has acknowledged that when you do have different or mixed messages in different circuits, an officer may be entitled, may not be put on fair notice, and qualified immunity may be appropriate. But the factual context, the unique factual context that that case dealt with involved situations where you have someone actively trying to avoid capture with people known to be in the immediate vicinity and at risk, engaging in dangerous vehicular flight. And in fact, in that case, Mr. Hagen apparently even pled guilty to driving in willful and wanted disregard of human life. And all of the cases cited in that opinion by the Supreme Court involved vehicular flight. None of those cases were any of the Ninth Circuit authority relied upon. There's no question that the Ninth Circuit has been remarkably clear about what is and isn't permissible in terms of using deadly force. That's how the officers were trained in this case, and it is well known. This is not a vague area. Now, in terms of, again, in the aftermath of Rousseau v. Hagen, does this mean that Fourth Amendment qualified immunity analysis is back at square one? No. We have the case of Crankhead v. Lee, the Eighth Circuit case, that says, yes, our facts are a little different, but clearly with deadly force with an armed individual, the law is pretty darn well set out. And this court is recognizing the city of San Jose Hells Angels v. San Jose, that you don't need a case on all square fours. I would also add, and I realize I'm running low on time here, but in terms of the facts, certainly the court did not view the facts in a light most favorable to the plaintiff in this case, because if you view those, you have someone who they know is emotionally disturbed, who they know through the training should be approached differently, they know he didn't harm anyone, that he hadn't made any physical or verbal threats, that he was wearing headphones during most of the police contact, that there was no grunt, growl, or roar, that he hadn't stiffened his body at any point, that he, based on the medical testimony and evidence, dropped the sword prior, certainly to the third group of shots, that there was no indication that anyone was in the house or the yard. There's just no evidence of that. That people, reasonable officer know people don't take swords for daytime burglaries, and I will say the rest of our time. Thank you. Mr. Cassidy. Good morning, your honors. May it please the court. Terrence Cassidy and Jennifer Duggan on behalf of Appellees County of Sacramento, Sheriff Blanis, and deputies Hengel and Anderson. In this case, your honors, the record clearly establishes that the use of deadly force was objectively reasonable and not a violation of the fourth amendment. Alternatively, the officers are clearly entitled to qualified immunity under the facts and circumstances as developed in this case. With respect to the claim that there was a violation under the fourth amendment, we know that the issue is whether the officers had probable cause to believe that Mr. Blanford posed a serious threat of great bodily injury, serious bodily injury or death to others. It boils down to the component, ultimately in Tennessee versus Garner, of the others. Who are the others? The others are the potential residents. Who are they? That they are the- Can you name anyone? The occupants, potential occupants of the home. Potential, you can name a single person. Mr. Blanford, Mrs. Blanford. Were they in the house? Mr. Blanford's sibling. It turned out, in hindsight, they were not. All right, well, can you name any single individual who was threatened with harm? Yes, I believe that the officers are threatened with harm should- When were they threatened with harm? Should Mr. Blanford turn on them- Oh, should he? When were they threatened with harm? I think they were- Not a hypothetical. I think they were threatened with harm specifically when Mr. Blanford was in the office. Was he looking at them? No, but I don't think one needs to look at it when you're holding a deadly weapon and you give them the medicine. You think a growl and a raising the thing is a threat to someone? Your Honor, I would respectfully submit that if that occurred to us- If they were threatened then, why didn't they shoot then? If that occurred to us- Why didn't they shoot then? They had enough distance between them, and likewise, they- So they were threatened. They were specifically testified- Excuse me, you're saying they were, such as this, they were not threatened. No, I didn't- Well, I have said they are threatened. If they were threatened in danger of deadly harm, they had a right to shoot at that moment. They did not shoot. But they have a right to determine not to shoot at that moment if they feel that under those circumstances it would not be prudent to do so. I think that shows the restraint of the officers in that area. I think that shows that your improbable thought that that was a threat did not continue. He did not continue to raise the sword and growl. And so the one instance you have which boasts as an argument to a jury that there was a threat, that disappeared. The threat disappeared. So there is no single human being that you can name who was actually in danger. There is no- The threat did not disappear. The threat increased. The threat increased, if I may, Your Honor, that there is- The question is, do officers need to know someone in the residence- No, but will you first concede my point? There is no single human being who was, you can name, who was threatened. Will you concede that, please? Single human being in the residence, no. No, it would be in the backyard or in the next- Or in the yard. But the fact that people live in a community, as has been pointed out by this Court on numerous occasions- A reasonable officer would have thought, was he going to his home or to a stranger? What do you think? A reasonable officer would have thought he was going to a stranger, but would not necessarily know. But what if he wasn't? One of the officers knew that he returned to a residence and had told his partner. He returned to a residence. He's on his way to a residence, and they don't know whether it's his home. But suppose he's in a rage against his family, and what he's decided to do- That's a wonderful hypothetical, but do they know that? Are we going to imagine the scenarios were justified for us? Your Honor, the officers cannot take the risk- Oh, but they cannot imagine scenarios either. The officers cannot take the risk that if this person enters that home and proceeds to cut up the individual's inside- Did they know he could get into the home? He was attempting to get in the home- Did they know he could get in? They don't know, and that's the problem. They know he- If he gets in and closes the door, he makes good his escape and creates- It's a very wild- You could write a novel about it, but we don't deal with novels. We deal with the hard circumstances that were presented to these officers to make a split-second decision in the field. They had plenty of time. They had less than two minutes to make a decision as to whether Mr. Blanford posed a significant threat of great bodily injury to others, and they did so under the best circumstances they can. It was the facts and circumstances created by Mr. Blanford that gave rise to the officers' concerns. If there's any misinterpretation of facts- You can make this argument to the jury. They might believe you, but they did know that nobody answered the doorbell, didn't they? They don't know that. They know he rang the bell. The officers, I don't believe, testified that they saw him ring a bell. In fact, the officers did not see him approach the front door. That's the testimony in light of the plaintiff, but the officers never saw him do that. The officer's testimony is he beelined across the lawn, across the driveway, toward the back of the residence, on the side of the garage. But even if you took that testimony that, in fact, assuming in the light most favorable of the plaintiff, he went up to a front door and then he went over around the garage, he then admits, having been aware that police officers were present, that they were screaming at him to drop the sword and he refused to do so. I have to respectfully submit, Your Honor, that a peace officer has an extremely heightened concern when an individual engages in the conduct as Mr. Blanford did. There's no question that's one of the scariest situations an officer's presented with. If they're wrong and if Mr. Blanford is in a rage to take out someone in the home and he's completely ignoring them, thinking, if I move slowly and deliberately and I move right into this house, they fire once and hit him. What's he do, Your Honor? Does he stop? Well, you've got a great imagination, Mr. Cassidy. Does he stop when he's first shot? You can supply all the imagination you want to a jury. Why does he continue, Your Honor? At the time that he's first shot, wouldn't you surrender? What would a reasonable person do? He's holding a deadly weapon. That's not what a reasonable victim would do. But what the officers then see, Your Honor, is an individual who continues on trying to make good to get into the house with the deadly weapon. He doesn't get in the house. He's shot again. And unfortunately, does he stop? No. If I'm an officer, I think he's then on drugs or so far out of it. I think we've probably explored this enough. But there is a question in my mind as to whether he still had the weapon at the point he was shot the third time. Because you can draw the inference from the facts in the record that he'd been shot and the weapon had fallen to the ground in the second volley. I respectfully disagree, Your Honor. Mr. Blanford's testimony is he did not know. In the officer's testimony, he was continuing to hold his weapon. I understand that. But there is a reasonable inference to be drawn the other way. I disagree, Your Honor. Similar to the case in which the individual's knife was found 43 feet away in Kruger, the Eighth Circuit case in 1993. That 43 feet away didn't mean that that suspect didn't have the knife at the time. Well, the fact that the sword is found several feet away does not necessarily negate that he was holding the sword. The best evidence You're absolutely right. It does not necessarily mean. It just means there's a dispute of fact as to where it was. Again, Your Honor. Whether he had it. Mr. Blanford's testimony is he did not know. That is not admissible supportive testimony that in fact that. No, no. It's not his testimony. It's where the record shows the sword was found. And that can be argued each way, your way and the other way to the jury. I respectfully, Your Honor, that's immaterial to the determination when Mr. Blanford says he does not know. We're not depending on Mr. Blanford. We're depending on the physical evidence. The physical evidence of what occurs with a weapon immediately upon the officers approaching to disarm a suspect, which is exactly what the officers testified to, is not a question of fact any longer. Why not? Because the fact is the only evidence is that the officers observed him holding the sword. They fired a third time. Mr. Blanford does not know. The officers approached Mr. Blanford and removed the sword. But you're sort of ignoring the point that if in fact the weapon had dropped from his hand, the officers were wrong and they shot him or one of them, the other one didn't, one of them shot him when he was disarmed. And that is something a jury can well sort out. And you can make a very persuasive case, but you cannot do it as a matter of law. I submit, Your Honor, there is no admissible relevant evidence to establish the point Your Honor has suggested. How would the qualified immunity come into play here? As the Supreme Court has told us in Saussure and Katz, we have to determine first whether there was any violation. You made a very good argument as to whether it was not. But if there were, how would the qualified immunity, how would you write that in this case, if you had to? I would prefer the decision on the Fourth Amendment. However, the approach taken is that Haugen is now dispositive. I'm sorry, what did I say? Haugen is dispositive in this case, and for several reasons. The Supreme Court has now refined for us that they do want the analysis for qualified immunity to look to factually specific case law. With respect to case law that involves what these officers were confronted with, there's no case law that shows, and no reported case that we were able to locate, that describes a circumstance similar to that faced by officers Hengel and Anderson. In this case, we have several that might be arguably close. Possibly the vehicle-related shootings are close. But again, the Supreme Court's found, most recently this year, that those types of cases clearly do not have an established law that would put an officer on notice that their use of deadly force was inappropriate. You go on the theory that it had not been clearly established that they could not do what they did. Is that true? It had not been clearly established that they could not do what they did. It had not been clearly established that their actions would violate a clearly established constitutional right of Mr. Blanford. And I would also submit, Your Honor's staff, that there is likewise a second problem that has not, I don't think we've discussed it in our brief, but I think it's worth mentioning, and that is whether these officers were reasonably mistaken in their belief. Mr. Blanford, we know now in hindsight, was headed home, but the officers didn't know that. They could be reasonably mistaken in their belief that Mr. Blanford posed a significant threat of great bodily injury or death. He was making good an escape. It turns out he was going into a residence. But his actions, his conduct, caused those officers to have a reasonable belief, a reasonably objective belief under the facts and circumstances of this case, that their actions were lawful under Tennessee v. Garner and by the other cases. There are a couple of cases that might help out. Perhaps the Ford v. Childers, although Ford involved the fleeing of the armed bank robber, but we know that the basis for the use of deadly force in that case had to do with the potential threat of that suspect to others. And those were others unknown to the officer, which I think is significant. They could not identify any particular individual who this bank robber posed a threat to. And, likewise, that then would tie in to Judge Noonan's analysis about whether they needed to know someone specific or not. That's not clearly established, we would submit, and, therefore, qualified immunity is appropriate. Likewise, the Kruger case, we do have an armed assault, but the individual is running. The officer believes he may be drawing the knife on him. He believes he might turn around. But even though there's uncertainty, the courts have found that that uncertainty is not sufficient to overcome the reasonable conduct of the officer. And even if there's a question on that, qualified immunity would apply. We look to Haugen to determine whether this falls in the hazy borders of the various cases that have been established. No case better fits that hazy border than this case for qualified immunity purposes now that the Supreme Court has given us the guidance in Haugen. So I would respectfully submit that we are dealing with undisputed facts in this case. It is undisputed that the conduct of Mr. Blanford, I would submit, showed a felony violation of the Penal Code for a menacing threat with a deadly weapon. He disregarded officers' clear verbal commands. He admits he knew there were officers present. He admits he ignored their verbal commands. He admits that he was trying to gain entrance to a residence. Certainly the protection of the residence and the community at large is necessary under these circumstances. These officers had and could not. They had moments to decide, seconds to decide whether they were going to allow this person with a deadly weapon to enter that residence. Could I engage you in a few more disputed facts? One is whether Blanford told them that he would put the sword away and come and talk to them. Do you consider that disputed or undisputed? I consider that was not in the evidence presented to the district court, that that is not in the record because counsel have waived that right to assert that fact. At the oral argument at the district court and in the final pretrial order, counsel indicated the facts are undisputed. And moreover, Your Honor, at the oral argument, counsel conceded, which is a judicial admission, that nothing the plaintiff has said should have any bearing on the outcome of this case. And I would respectfully submit, Your Honor, that therefore, counsel for Mr. Blanford have specifically waived any right to assert that comment by Mr. Blanford. And it's not in evidence. You don't deny that that is testimony. I do not deny that's his testimony, but that he did not know whether the officers could hear him and, well, I do deny that it was his testimony that's admissible evidence, because he says, I think I said. He didn't say, I said to these officers. He couldn't remember if he really had said that. He says, in my mind, I think I said it. But I don't know if I said it. No, I think is a way that timid people often express themselves. It doesn't mean that they aren't asserting it. But anyway, I take your position. We can see whether it holds up. And do you believe that the officers knew he could enter the garage? Your Honor, at the time that the second shots are fired, Mr. Blanford's hand is on the door and he's attempting to get in that door. But has he failed? Isn't there some suggestion that he has failed to enter the garage? No, that it was Mr. Blanford says later it was locked. Yeah. Later he says it was locked. The officers can't tell that it's locked at the time they fire the shots. But the third volley, he hasn't been able to do it. No, in the third volley, he's now decided, for some unknown reason, not to surrender, not to surrender the sword. And now he's turned around and he's headed to the backyard of the residence. Is that somebody's there working in the backyard? It's no different than Mr. Foret jumping over the fence of the yard when he was escaping from the officers. The officers shot through the fence and injured him. They used deadly force through the fence because Mr. Foret was a threat to others in the residence, in the next door residence. And that's the same thing that we have here, Your Honor. If there's, heaven forbid, a young child and mother in that backyard sitting by their patio and that Mr. Blanford now is going to use his sword on them, the officers can't take that risk. And we don't want them to take that risk, I would respectfully submit, Your Honor. In summary, I believe that the clear, undisputed evidence has established that there was not a violation of the Fourth Amendment in this case. Alternatively, we would respectfully submit that the Haugen case is now dispositive. There is no clearly reported case law, nor is there any case law close to this case that would provide us with this guidance. And therefore, clearly, there is no clearly established law that would put a reasonable officer in the position of Officers Hengel and Anderson on notice that their conduct may violate the rights of Mr. Blanford. I would also respectfully submit that it was his conduct, Mr. Blanford's conduct, that gives rise to a reasonable but mistaken belief that their conduct was law, meaning the officer's conduct was lawful. And that's the Malley v. Briggs analysis, essentially. But in parting, and I would like to add, lastly, that it's clear that these officers were making a split-second decision. It might have been in steps, in inches, as opposed to a half a second, but it certainly was nothing that evolved over a long period of time. It was not the 24 hours in Ruby Ridge, which I submit the Cournot case is simply not anywhere near the facts of this case. But I want to add one last thing, and it was raised in the Killeen case back in 1985, and it's been reported in several authorities since then in the case law. And I think it's very telling in this case, and that is there is no right guaranteed under Federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his own acts. And is this a tragic case? Yes. But the officers are not liable under the Fourth Amendment and or are entitled to qualified immunity. Respectfully submitted, Your Honors. We would request that the Court affirm the summary judgment of the district court. Please, Mr. Clark. What we're dealing with, there's no question what the law is. It's absolutely clear. For the last 20 years, the counsel earlier for the city, you asked us to get together with the previous people and consult. Counsel for the city said there must be, to use deadly force, an immediate, an immediate and deadly peril. And Judge Thompson, you asked, at the moment of the firing of the gun in that last case, was there such? And that's the case here. And let's keep in mind, there are three shootings here. And in each instance, they must be constitutional. We are talking about the taking of life. We are talking about when does government sanction the taking of human life. That's what's at risk. And with objective standard, not just what the DOS is. Because Judge Noonan is absolutely right. And in fact, in their brief, they say the possibilities that Blanford would threaten someone are endless. He never did. He never did at any time. They knew over 20 or 30 minutes he had passed lots of people. He had walked miles. They discussed the fact that the exact same thing had happened sometimes earlier to one of the officers where no one was injured. The person obviously went back to his residence. I mean, there are only so many sword lickers in this community. I mean, this is a guy who's distraught, obviously. They know it. In the same manner as people outside this courthouse are distraught and don't respond to officers because of their problems. But the fact is that it must be, and Judge, you say, you know, what do they have to wait? And they say here, can they take the risk? Objectively, they know he has threatened no one. Objectively, they know, unlike for rec, which is decided correctly in all the cases under it, where the person is a murderer, has taken hostages and done these things, our guy's done none of those things. He's just a guy wandering. That's all. Wandering the neighborhood. And it's not illegal. And it's not even illegal. And they say they'd shoot him if it was a baseball bat. So it's not even the fact that it's a sword. But at the time, immediate threat, they said, well, and remember, I'll just take the third because I don't want to repeat everything, the third shooting, because that's what rendered him a paraplegic. And there's no question about it. And it's stipulated. The facts are stipulated. After he finds that the door is locked, remember this residence, they say, what if he got inside? They now know the residence is locked. He cannot get in. He turns, they say. And they're right, not just because they stipulate, but that taking it the best and so forth in their favor. He turns, he starts walking away. They form the intent to shoot him again. This is a semiautomatic. They have to fire every time they want to hit him. Five or ten yards, feet away, finally, they stop him immediately with a bullet in his back. Why? Where is the imminent threat? Who is available? No, no. But let me just say the imminent threat. You're way out of time. All right? I had five minutes, Your Honor. I'm sorry. I made it very clear at the outset that time runs down from the top. I understand, Your Honor. You're over by a minute. We understand the argument that you made. The jumping over a fence, Your Honor, and the officers are under control here with guns. You have exceeded your time. Thank you both for your argument. The matter just argued to be submitted. The Court will stand and recess or adjourn.
judges: Noonan, Thompson, Rymer